Carroll
No. 2002-080

JANICE J. COOK & a.

v.

JOHN D. SULLIVAN & a.

Argued: June 11, 2003
Opinion Issued: August 22, 2003

*Walker & Varney P.C.*, of Wolfeboro (*Mark S. Derby* and *Robert C. Varney* on the brief, and *Mr. Derby* orally), for the plaintiffs.

*Normandin, Cheney and O'Neil*, of Laconia (*Philip P. Bonafide* on the brief and orally), for the defendants.

DALIANIS, J. The defendants, John and Diane Sullivan, appeal a decision of the Superior Court (*T. Nadeau*, J.) finding that they created a nuisance on the plaintiffs' property by filling and regrading jurisdictional wetlands and constructing a home on their property. We affirm.

Since 1946, the plaintiffs, Janice J. Cook, Vanessa Cook Jacobsohn, Cecil D. Driver, individually and as trustee of the John Cook Driver Trust,

Carole Evans Sands, Susan Evans Burkley, Liane Evans Gigas, Melissa Evans Voteur, and Jonathan Richard Evans, have owned property on Lake Winnipesaukee in Moultonboro. Over the years, they have built various structures on the property, including a main house, a garage and a guest house/chalet. In 1996, the defendants purchased an abutting parcel of property.

At the time of the purchase, the defendants obtained a building plan for the construction of a septic system for a four-bedroom house, prepared by Charles Bollinger, a certified wetlands scientist. In late 1996, the defendants had a three-bedroom modular house placed on their property. Defendant John Sullivan testified that his modular house was primarily pre-built at a factory, then driven to the site and placed on the foundation with a crane. In the course of construction, the defendants used large quantities of fill in the area where they were building the house. In 1997, the plaintiffs began experiencing increased wetness, which they claim lasted for extended periods of time, on their property. Specifically, the plaintiffs claimed, among other things, that, since the construction, standing water accumulated in their garage and underneath the chalet, and that the water has interfered with their ability to use their property as they had in the past. They also claimed that this condition persisted each summer from 1997 to 2001. In 1998, however, the lake reached its highest level in one hundred years, which worsened the wetness on the plaintiffs' property.

In 1999, the plaintiffs complained to the defendants, who attempted to remedy the problem by removing some fill along the parties' common boundary line, digging a drainage ditch and moving a wall. The plaintiffs, however, claimed that the condition of their land did not change. They filed a petition for injunctive relief in July 2000 alleging: 1) common law nuisance; 2) water diversion; 3) trespass; and 4) negligence *per se* based upon a violation of RSA chapter 482-A. In addition, the plaintiffs filed a complaint with the New Hampshire Department of Environmental Services Wetlands Bureau (wetlands bureau).

The wetlands bureau investigated the complaint and eventually approved a remediation plan, which required the defendants to remove some of the fill placed on the property during construction. The plaintiffs were not allowed to go on the defendants' property during the investigation to observe and were not included in the remedial plan negotiations. According to the wetlands bureau, the defendants satisfactorily complied with the remediation plan. The plaintiffs maintained, however, that the defendants' actions did not remedy the water damage to their property and requested reconsideration of the wetlands bureau decision, which was denied. Prior to trial, the defendants

filed a motion *in limine* arguing that the plaintiffs were precluded, under the doctrines of res judicata and collateral estoppel, from claiming that the defendants failed to comply with RSA chapter 482-A or that the defendants should be subject to a remedy different from that required by the wetlands bureau remediation plan. The trial court denied the motion. The defendants subsequently sought to introduce the entire wetlands bureau file at trial, which the court also denied.

The trial court ruled that the defendants' construction activities constituted a nuisance that damaged the plaintiffs' property, and that the remedy was to remove the fill and foundation from the jurisdictional wetlands, which would necessarily require the defendants' house to be moved. In its order, the trial court referred to a chart prepared by the plaintiffs' expert and used during trial but not admitted into evidence, as illustrating the area where the defendants' house encroached upon jurisdictional wetlands. By way of clarification, the court subsequently allowed the chart to be marked for identification and incorporated into its order. The trial court denied the defendants' motion to reconsider and this appeal followed.

The defendants first argue that the plaintiffs should be barred, under the doctrines of res judicata and collateral estoppel, from litigating the issue of whether the defendants violated RSA chapter 482-A and what the appropriate remedy should be for such a violation.

"Spurred by considerations of judicial economy and a policy of certainty and finality in our legal system, the doctrines of res judicata and collateral estoppel have been established to avoid repetitive litigation so that at some point litigation over a particular controversy must come to an end." *Eastern Marine Const. Corp. v. First Southern Leasing*, 129 N.H. 270, 273 (1987) (quotation omitted). Under res judicata, a final judgment by a court of competent jurisdiction is conclusive upon the parties in a subsequent litigation involving the same cause of action. *West Gate Village Assoc. v. Dubois*, 145 N.H. 293, 296 (2000). Whether a claim is barred by res judicata is determined on a case-by-case basis. *Hallisey v. DECA Corp.*, 140 N.H. 443, 445 (1995).

■ We have stated previously that the reasons underlying the doctrine of res judicata are fully applicable to *some* administrative proceedings. *Meserve v. State*, 119 N.H. 149, 154 (1979). Res judicata has been applied to a decision of an administrative agency, such as the labor commissioner or his deputy, which was rendered in a judicial capacity, resolved disputed issues properly before it and which the parties had an opportunity to litigate. *Morin v. J.H. Valliere Co.*, 113 N.H. 431, 434 (1973). In order for res judicata to apply to an administrative decision, however, the officer or

board must have been acting in a judicial capacity. *See* 46 AM. JUR. 2D *Judgments* § 580 (1994); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 83 (1982) (decision of administrative tribunal is conclusive under res judicata so long as proceeding resulting in determination entailed essential elements of adjudication).

■ A review of the record in this case reveals that the wetlands bureau was not acting in a judicial capacity when it investigated the plaintiffs' complaint. As the trial court correctly found, the plaintiffs did not actively participate in the proceedings before the wetlands bureau and were not included in the negotiations between the wetlands bureau and the defendants regarding the remediation plan. Thus, unlike a typical adjudicative proceeding, the plaintiffs were not afforded the opportunity to present evidence of their damages and could not rebut the defendants' remediation plan prior to its acceptance. The focus of the wetlands bureau was to investigate and enforce the wetlands regulations under RSA chapter 482-A to ensure compliance, not to protect the plaintiffs' rights. *Cf. Gray v. Seidel,* 143 N.H. 327, 330 (1999) (authority of wetlands board to regulate does not include the power to determine the relative rights of property owners).

Nor were the plaintiffs parties to the underlying enforcement action. In situations such as this, where the victim of a statutory wrong complains to the appropriate agency but is not given control over the enforcement proceeding, it is the agency rather than the victim that is the party to whom the rules of res judicata apply. *See* RESTATEMENT (SECOND) OF JUDGMENTS §83 comment *c* at 272. As a result, the plaintiffs were not barred from bringing their claims under the doctrine of res judicata.

Nor do we agree that the doctrine of collateral estoppel precludes the plaintiffs from litigating claims before the superior court.

> [T]he doctrine of collateral estoppel bars a party to a prior action, or a person in privity with such a party, from relitigating any issue or fact actually litigated and determined in the prior action. Three basic conditions must, then, be satisfied before collateral estoppel will arise: the issue subject to estoppel must be identical in each action, the first action must have resolved the issue finally on the merits, and the party to be estopped must have appeared as a party in the first action, or have been in privity with someone who did so. These conditions must be understood, in turn, as particular elements of the more general requirement, that a party against whom estoppel is pleaded must have had a full and fair prior opportunity to litigate the issue or fact in question.

*Gephart v. Daigneault*, 137 N.H. 166, 172 (1993) (quotation and citation omitted).

■ "The relationship between party and non-party implied by a finding of privity in the estoppel context has been described as one of virtual representation, and substantial identity." *Daigle*, 129 N.H. at 571 (quotations omitted). These phrases imply not a formal, but a functional, relationship, in which, at a minimum, the interests of the non-party were in fact represented and protected in the prior litigation. *Id.* Thus, privity is found to exist, for example, when a person controls or substantially participates in controlling the presentation or if a non-party authorizes a party in litigation to represent his or her interests. *Id.* at 571-72. There is no evidence in the record that the plaintiffs either controlled the underlying wetlands bureau enforcement action or authorized the wetlands bureau to act on their behalf. Thus, we conclude that the plaintiffs' interests were not adequately represented for purposes of privity. In addition, as noted in our discussion of res judicata, the plaintiffs were not afforded a full and fair prior opportunity to litigate the issues and facts in question. The plaintiffs, therefore, were not collaterally estopped from proceeding in superior court.

The defendants assert, alternatively, that the issue of whether they violated RSA chapter 482-A is moot. The defendants did not raise this argument below, however, and thus have not preserved it for our review on appeal. *See McKenzie v. City of Berlin*, 145 N.H. 467, 471-72 (2000).

■ The defendants also argue that the trial court erred by failing to admit the entire wetlands bureau file at trial. We disagree. While not admitting the entire file, the trial court did allow it to be marked for identification, and allowed the defendants to enter certain exhibits from the file individually. In addition, some of the information included in the file was introduced through trial testimony. Finally, the defendants argue that one of the central purposes of introducing the file was to bolster their res judicata and collateral estoppel arguments. Since we have already rejected these arguments, the significance of the wetlands bureau file is diminished. Even assuming, therefore, that the trial court erred in failing to admit the entire wetlands bureau file at trial, we conclude that such decision was not clearly untenable or unreasonable to the prejudice of their case. *See Petition of Haines*, 148 N.H. 380, 381 (2002).

■ The defendants next argue that the trial court erred by referring to a chart that was not in evidence to describe the location of jurisdictional wetlands on their property. They also assert that the trial court failed to

cure this error by marking the chart for identification in its clarification order. We disagree. In its order, the court stated that

> the evidence demonstrates that the jurisdictional wetland boundary runs through the lower portion of the Sullivan home along the red jurisdictional boundary line, closest to the lake, as depicted on the chart the petitioners used during trial and as delineated by Randall Shuey, and just below the boulder slope.

"A review of the entire record leads us to conclude that even if the [chart] was never properly entered as an exhibit, the trial court's reliance upon it resulted in no prejudice to the [defendants] and did not affect the outcome." *Patch v. Arsenault*, 139 N.H. 313, 320 (1995). The chart referred to was used merely for descriptive purposes and was cumulative when considered in conjunction with the lay and expert testimony introduced at trial and the trial court's views of the property. Thus, the trial court's reference to the chart does not constitute reversible error.

We now consider whether there was sufficient evidence to support the trial court's decision that the defendants' construction activities constituted a nuisance, thereby causing damage to the plaintiffs' property. We will uphold the trial court's findings and rulings unless they lack evidential support or are legally erroneous. *In the Matter of Levreault and Levreault*, 147 N.H. 656, 657 (2002). It is within the province of the trial court to accept or reject, in whole or in part, whatever evidence was presented, including that of the expert witnesses. *See Tennessee Gas Pipeline Co. v. Town of Hudson*, 145 N.H. 598, 602 (2000). Our standard of review is not whether we would rule differently than the trial court, but whether a reasonable person could have reached the same decision as the trial court based upon the same evidence. *Hawthorne Trust v. Maine Savings Bank*, 136 N.H. 533, 536 (1992). Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence. *McCabe v. Arcidy*, 138 N.H. 20, 24 (1993).

"A private nuisance exists when an activity substantially and unreasonably interferes with the use and enjoyment of another's property." *Dunlop v. Daigle*, 122 N.H. 295, 298 (1982). To constitute a nuisance, the defendants' activities must cause harm that exceeds the customary interferences with land that a land user suffers in an organized society, and be an appreciable and tangible interference with a property interest. *Id.* "In determining whether an act interfering with the use and enjoyment is so unreasonable and substantial as to amount to a nuisance and warrant an injunction, a court must balance the gravity of the harm to

the plaintiff against the utility of the defendant's conduct, both to himself and to the community." *Treisman v. Kamen*, 126 N.H. 372, 375 (1985) (quotation omitted). It is the plaintiffs' burden to prove the existence of a nuisance by a preponderance of the evidence. *Dunlop*, 122 N.H. at 295.

The evidence supports the trial court's finding of nuisance. At trial, witnesses testified that large portions of the defendants' lot were swampy and had pools of standing water prior to construction. The plaintiffs' expert, Randall Shuey, a certified soil scientist, testified that he conducted extensive testing of the defendants' property subsequent to their construction and opined that the defendants' activities had interfered with jurisdictional wetlands and had caused subsurface waters to divert to the plaintiffs' property. The defendants argue that the trial court unreasonably ignored the testimony of their expert, Charles Bollinger, who was the only person to have tested the defendants' property prior to construction and who stated that the defendants' house was not built upon jurisdictional wetlands. Bollinger admitted, however, that he did not perform specific soil testing to detect the presence of wetlands and that his findings were based primarily upon visual examination.

Further, the plaintiffs testified that their property was substantially wetter after the defendants built their house. The defendants assert that there was insufficient evidence to support this finding, or that the wetness problems continued to exist at the time of final hearing, because the plaintiffs' property was wet before construction. While there was evidence that portions of the plaintiffs' property were wet prior to the defendants' construction, numerous witnesses testified that the water levels increased following the defendants' construction. This testimony was corroborated by Shuey's statement that the defendants' construction altered the elevation of the defendants' land as well as the flow of subsurface waters, causing increased wetness on the plaintiffs' property. While there was evidence introduced of flooding in 1998, Shuey stated that, while having a short-term effect, the flooding did not cause the prolonged wetness the plaintiffs experienced in later years. Moreover, the plaintiffs testified that this condition on their property repeated each spring and early summer from 1997 to 2001.

The defendants contend that the trial court ignored the testimony of Paul Fluet, a civil engineer, when it found that the defendants did not remedy the water diversion problem. Fluet admitted, however, that he was not a wetlands scientist, and that he visited the defendants' property for the purpose of finding any problems with surface water drainage.

The plaintiffs also illustrated various problems associated with the increased wetness. For example, they testified that following the

construction, there was standing water on their property, both on a large portion of the lawn, including the backyard between the chalet and the garage, and under the garage and chalet. They explained that because of the increased wetness, they were forced to move dog pens that they traditionally kept in the lower part of their property, and that they could no longer hang a clothesline or stack firewood in the backyard, or use the backyard for recreational activities. Plaintiff Jonathan Evans testified that he had trouble mowing the lawn because of the water. The plaintiffs also explained that they could no longer store things directly on their garage floor due to standing water in the spring and early summer months. Further, they testified that there was a strong, musty odor in the chalet after water began collecting under the foundation, which prevented them from using the chalet during those months when the windows are closed.

Given the evidence in the record, we cannot hold that the trial court erred in finding that the defendants' construction created a nuisance resulting in damages to the plaintiffs' property.

 Having concluded that there was sufficient evidence to support the trial court's findings that the defendants' activities constitute a nuisance, we now must determine whether the remedy was appropriate. In evaluating the appropriateness of injunctive relief, the court utilizes the same balancing test that is used to first identify whether a nuisance exists, "although the scales must weigh more heavily in the [plaintiff's] favor because of the extraordinary nature of this form of relief." *Robie v. Lillis*, 112 N.H. 492, 497 (1972). The propriety of affording equitable relief in a particular case rests in the sound discretion of the trial court to be exercised according to the circumstances and exigencies of the case. *Geiss v. Bourassa*, 140 N.H. 629, 631 (1996). We will uphold a trial court's equitable order unless its decision constitutes an unsustainable exercise of discretion. *See id.*; *see also State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). If the defendants' activity can be carried on without causing unreasonable interference to the plaintiffs, then they should not be required to remove their house. *See Dunlop*, 122 N.H. at 300. On the other hand, an order requiring such removal is justified if there is no other way to abate the private nuisance. *See Urie v. Franconia Paper Co.*, 107 N.H. 131, 134 (1966).

The defendants challenge the ordered remedy, arguing that the trial court neglected to balance the hardships between the parties and that there was insufficient evidence to support its decision.

With regard to remedying the nuisance, Shuey stated specifically that "the only way to guarantee that we're not going to have any additional

impacts on the Cook/Evans property, or to restore it to what it was previously, is to move that house and all that fill out of the jurisdictional area, out of the jurisdictional wetlands." He also stated that this could be accomplished by moving the defendants' house and foundation back forty or fifty feet on the property. In its order, the trial court acknowledged the severity of the remedy, but stated that:

> The credible evidence, including the observations made on the view, demonstrates that the Sullivan lot, before it was developed, was obviously marshy and swampy below the clearly delineated boulder slope. Notwithstanding the apparent wetlands located on the lot, the respondents brought in significant fill without contacting the abutters for approval and without obtaining a permit from the wetlands board.

> The plaintiffs have prevailed on their claim of nuisance and are entitled under the law to an order requiring the respondents to fully abate the nuisance. The testimony presented from the plaintiff's [sic] expert indicates that the only remedy certain to guarantee a full abatement is removal of the home and fill. The plaintiffs should not be required to accept an alternate remedy, the efficacy of which is questionable, simply because full abatement appears harsh.

The defendants did propose a less stringent remedy to the trial court, which involved removing fill within twenty feet of the plaintiffs' boundary and constructing a ditch near the boundary for water discharge. Shuey testified, however, that he could not guarantee that the plaintiffs' property would be restored to its condition prior to the defendants' construction. The defendants did not offer any expert testimony at trial in support of their proposed remedy nor did they offer any other alternate remedies.

The record reflects that the trial court took the hardships of both parties into consideration when deciding the remedy. For example, the trial court explained in its final verdict that it was prepared to decide what remedy "would be equitable and fair under all the circumstances." Further, the court told the parties during trial that it was considering the equities of both parties when considering the appropriate remedy. Moreover, the court adopted the unusual procedure of viewing the property both before and after it took testimony and reviewed the exhibits. Having considered the evidence before the trial court, we agree that the gravity of harm to the plaintiffs resulting from the defendants' nuisance is significant enough to support the trial court's remedy.

Consequently, we find sufficient evidentiary support for the trial court's remedy and uphold its decision.

*Affirmed.*

DUGGAN, J., concurred; MURPHY, C.J., and SMITH and McHUGH, JJ., superior court justices, specially assigned under RSA 490:3, concurred.