NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Grafton
No. 2017-0198


LOON VALLEY HOMEOWNER'S ASSOCIATION

v.

LEWIS G. POLLOCK & a.

Argued:  April 12, 2018
Opinion Issued:  June 22, 2018

Wescott Law, PA, of Laconia (Paul T. Fitzgerald and Brett W. Allard on the brief, and Mr. Fitzgerald orally), for the plaintiff.

Cleveland, Waters and Bass, P.A., of Concord (William B. Pribis on the brief and orally), for the defendants.

HANTZ MARCONI, J.  The plaintiff, Loon Valley Homeowner's Association (the Association), appeals an order of the Superior Court (MacLeod, J.) denying its petition to quiet title to land owned by defendant Lewis G. Pollock and the decedent, Norman Wallack, based upon a claim of adverse possession.  We affirm.

I

The pertinent facts follow.  In 1972, Pollock and his two brothers purchased a vacation home and accompanying land in Lincoln.  They conveyed

the property to a trust and divided it into two lots: Lot 11, which contained the house, and Lot 7. After purchasing the property, Pollock constructed nine condominiums on Lot 11, numbering them units 1 through 9 and designating the existing house on Lot 11 as unit 10. In 1973, Pollock and his brothers incorporated the Association and conveyed Lot 11 and its improvements to it. The trial court found that Lot 7 was not conveyed to the Association because Pollock hoped to develop it in the future for commercial purposes.

Pollock purchased unit 7, and his brothers purchased units 9 and 10. The remaining units were subsequently purchased by Pollock's law partners, clients, and friends, including Norman Wallack, who then joined the Association. The trial court found that

> [p]ursuant to the Association's governing documents and the deeds by which Association property was conveyed, each member of the Association was granted individual ownership of a certain Unit and the land upon which it was directly situated, along with an "easement of use and enjoyment" for the Association's "Common Property," which consisted of all Lot 11 land and improvements but for the Units themselves and the land located directly thereunder.

(Footnote omitted.)

In 1978, when a house and land abutting Lot 11 became available for purchase, Pollock solicited members of the Association to help purchase the property. Only Wallack agreed to collaborate with Pollock and the two men purchased the property for approximately $60,000. The cost of updating the home, however, proved to be financially prohibitive, and the men subsequently decided to sell the property. In 1979, Pollock and Wallack sold the house and a portion of the land, collectively Lot 13, at a loss of approximately $12,500. They retained ownership of approximately .24 acres of the land which abuts Lot 11. The .24 acres became Lot 12, which is the subject of this litigation. To delineate the property, Pollock had a fence installed that separated Lot 12 from Lot 11.

Pollock testified at trial that he and Wallack retained Lot 12 hoping to add it to the Association's property to offset their loss. Pollock explained that after unsuccessfully seeking direct compensation from the members in exchange for adding Lot 12 to the Association, he and Wallack agreed to allow the members of the Association to use Lot 12 on the condition that the Association maintain the lot, pay the property taxes, and relocate the fence dividing Lots 11 and 12 to its current location, where it marks the approximate boundary between Lots 12 and 13. Pollock testified that the Association agreed to this arrangement, and that the arrangement was well known to the members of the Association, especially the Northfields who were "the most interested

2

people." The parties do not contest that, since 1979, the Association has paid the property taxes and upkeep expenses for Lot 12 and that the Association relocated the fence in 1979 at its expense. The trial court found that "[c]urrently, Lot 12 is mostly a grassy lawn, apart from several trees and landscaped shrubbery that line the fence."

William Northfield, the only original member of the Association other than Pollock to testify at trial, testified that he never discussed with Pollock or anyone else the fact that Pollock and Wallack owned Lot 12, despite admitting that he discovered in his possession a 1979 letter from Pollock to a surveyor referring to the sale of Lot 13 and the fact that Pollock and Wallack were retaining part of the land which they intended to add to the Loon Valley common land. Northfield also testified that he never questioned why the fence was relocated, despite the fact that: it moved from a distance of a few feet from his unit to a distance of approximately 80 feet, thereby increasing the alleged common property by approximately 15 percent; he learned some time in 1979 that the Association had paid to move the fence; and he understood this to mean that Lot 12 had formally become part of the Association's common property.

Three individuals who became members of the Association after 1988 testified that they were unaware that Lot 12 was not part of the Association's common property. The trial court found that each of these individual's deeds referred to the Loon Valley site plan dated December 1973 and recorded at the Grafton County Registry of Deeds, and that the plan does not include Lot 12 within the Association's boundaries. Nonetheless, each individual testified that when they joined the Association, they assumed that the Association's common property included all land bounded by the fence dividing Lots 12 and 13 and that they never observed any member of the Pollock or Wallack families restrict any Association member from using Lot 12.

Sometime around 2014, there was a restructuring of the Association's management, and one of the Association's new treasurers discovered that the Association had been paying separate tax bills for Lot 11 and Lot 12. The new treasurers investigated the ownership of Lot 12 and learned that Pollock and Wallack were the record owners. In 2015, Northfield sent Pollock an e-mail concerning the disputed parcel and stated that if Pollock did not execute a quit claim deed, the Association might be required to bring a claim of adverse possession in order to merge Lots 11 and 12. Pollock, thereafter, notified the Association that he revoked his permission for the Association to use Lot 12. The trial court found Pollock's testimony to be credible.

Following trial, the court found that the Association's use of Lot 12 was permissive and that, even if the court were to assume that the Association's use of Lot 12 was such that Pollock and Wallack should have known that the Association had repudiated their permission, it had failed to demonstrate that

3

such use was exclusive for a twenty-year period.  The Association unsuccessfully moved for reconsideration, and this appeal followed.

II

On appeal, the Association argues that the trial court erred: (1) when it found "a permissive arrangement between Lewis Pollock and the Association, and thus that the Association's use of Lot 12 was not adverse"; and (2) when it ruled that the Association "had not established that it had utilized Lot 12 exclusively" during the twenty-year prescriptive period.

In reviewing a trial court's decision rendered after a trial on the merits, we uphold the trial court's factual findings and rulings unless they lack evidentiary support or are legally erroneous.  O'Malley v. Little, 170 N.H. 272, 275 (2017).  We do not decide whether we would have ruled differently than the trial court, but rather, whether a reasonable person could have reached the same decision as the trial court based upon the same evidence.  Id.  Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence.  Id.  It is within the province of the trial court to accept or reject, in whole or in part, whatever evidence was presented.  Cook v. Sullivan, 149 N.H. 774, 780 (2003).  Additionally, the trier of fact is not required to believe even uncontroverted testimony.  Brent v. Paquette, 132 N.H. 415, 418 (1989).  We review the trial court's application of the law to the facts de novo.  Little, 170 N.H. at 275.

To acquire title to real property by adverse possession, the possessor must show twenty years of adverse, continuous, exclusive, and uninterrupted use of the land claimed so as to give notice to the owner that an adverse claim is being made.  Mastroianni v. Wercinski, 158 N.H. 380, 382 (2009).  A use of land is adverse when made under a claim of right where no right exists.  Id.  Adverse use has been defined as a use without license or permission; it is trespassory in nature.  Id.  Use is trespassory if it consists of a wrong which the fee holder can prevent or for which he can obtain damages by means of legal action.  Id.  To satisfy the adverse use requirement, the nature of the use must have been such as to show that the owner knew or ought to have known that the right was being exercised, not in reliance upon the owner's toleration or permission, but without regard to the owner's consent.  Bonardi v. Kazmirchuk, 146 N.H. 640, 642 (2001).  Whether a use of property is adverse is an issue of fact.  Id. at 643.

To establish a prima facie case of adverse use, a claimant must first produce evidence of acts of such a character that they create an inference of non-permissive use.  Sandford v. Town of Wolfeboro, 143 N.H. 481, 485 (1999).  Once this initial burden has been satisfied, the burden shifts to the landowner to produce evidence that the claimant's use of the land in question was, in fact,

4

permitted.  Id. at 486.  "If a use is made pursuant to the permission of the owner of the would-be servient estate, that use cannot be adverse."  Town of Warren v. Shortt, 139 N.H. 240, 244 (1994).  Thus, a use of another's land that began under that person's permission "cannot become adverse in nature without an explicit repudiation of the earlier permission."  Id.

The success or failure of a party claiming adverse possession is not determined by the subjective intent or the motives of the adverse possessor.  Blagbrough Family Realty Trust v. A & T Forest Prods., 155 N.H. 29, 33 (2007).  Rather, the acts of the adverse possessor's entry onto and possession of the land should, regardless of the basis of the occupancy, alert the true owner of the cause of action.  Id.  In evaluating the merits of an adverse possession claim, courts are to construe evidence of adverse possession of land strictly.  Id.

The Association first argues that the trial court erred by "failing to apply the appropriate legal standard" as set forth in Sandford, 143 N.H. at 485.  (Bolding omitted.)  It contends that, despite receiving evidence at trial that created an inference of adverse use, the trial court failed to apply the burden-shifting framework of Sandford and "neglect[ed] to make any findings regarding the Association's initial burden of production."  The Association contends that the trial court failed to shift the burden to the landowner to produce evidence of permission and, thus, erred as a matter of law.  A review of the record, however, shows that the trial court, in fact, expressly applied the burden-shifting analysis set forth in Sandford.

At the close of the Association's case, Pollock and defendant Edward Wallack, executor of the decedent's estate, moved for a directed verdict, arguing that the Association had failed, as a matter of law, to carry its burden of showing that there was a lack of permission.  In denying the motion, the trial court specifically discussed the shifting burdens of proof contained in Sandford.  The trial court reasoned that, pursuant to Sandford,

> to establish a prima facie case on an adverse use, a claimant must initially produce evidence of acts of such character that created [an] inference that the claimant adversely used the landowner's property, that is used it without permission . . . .
>
> [O]nce the claimant establishe[s] the initial burden of production that burden then shift[s] to the landowner to produce evidence that the claimant's intrusive acts were, in fact, permitted.  This is not a shifting burden of persuasion.  Once the claimant establishes the initial burden of establishing a prima facie case, the burden of production shifts to the landowner . . . to produce evidence to the contrary on the issue of permission or run the risk that the fact finder find in the claimant's favor.

5

The claimant always maintains the burden of persuasion on the issue of absence of permission as a necessary component of the claim of right or adverse use required . . . to prevail.

Based upon the evidence presented by the Association in its case-in-chief, the trial court found that the Association had presented a prima facie case. Accordingly, the trial court denied the defendants' motion for a directed verdict. We find no error.

The Association next argues that the trial court erred in ruling that its historic use of Lot 12 was not adverse on the basis of a permissive arrangement between Pollock and Wallack and the Association. It contends that the trial court "misconstrued the evidence, which tends to show that the Association members' use was adverse from 1995 to 2015." We disagree.

The trial court found that the evidence presented at trial was

consistent with Lewis Pollock's testimony that he and Norman Wallack gave permission to the Association to use Lot 12 on the condition that the Association pay Lot 12's taxes, its maintenance costs, and to move the fence. Consistent with this finding, it is uncontested that the Association's administrators paid Lot 12's property taxes on behalf of the defendants from 1979 to 2014, and there is no evidence that any member of the Association sought to merge the titles of Lots 11 and 12 prior to 2014, suggesting that these administrators at least understood that the [defendants] owned Lot 12 and that the Association's use of Lot 12 was somehow permissive. Even if the court were to credit William Northfield's testimony that he was never apprised of such an arrangement, Mr. Northfield's mere lack of knowledge does not necessarily suggest that no such arrangement existed.

The trial court rejected the Association's argument that it met its burden of proof to show adverse use, reasoning that the subjective beliefs or motives of the adverse possessor were not determinative and that, moreover, "'when a use of another's land began under that person's permission, it cannot become adverse in nature without an explicit repudiation of the earlier permission.'" (Quoting Shortt, 139 N.H. at 244 (brackets omitted).)

Furthermore, the trial court reasoned, even assuming without deciding that Pollock and Wallack "should have known that numerous members of the Association subjectively believed that the Association in fact owned Lot 12," the court was not persuaded that "the Association's use of Lot 12 should have alerted [them] that the Association, as a legal entity, had repudiated the defendants' permission." As the trial court stated, "To the contrary, the evidence overwhelmingly demonstrates that the Association fully complied with

6

[Pollock's and Wallack's] conditions, principally by paying Lot 12's taxes, and that the Association's members used Lot 12 as [Pollock and Wallack] contemplated, that is for recreational purposes consistent with the Association's communal environment."

Although the Association contends that Pollock's testimony of a permissive arrangement was "completely uncorroborated" and "self-serving," the trial court expressly found "credible and persuasive" his testimony that the Association agreed to maintain Lot 12, pay the property taxes, and relocate the fence in exchange for the use of Lot 12 indefinitely, and that this arrangement was well known to the members of the Association. "Since the trial court had the advantage of seeing and hearing the witnesses on the stand, we will not substitute our judgment for that of the trial court." Paquette, 132 N.H. at 419.

We have reviewed the record and conclude that the trial court's factual findings are supported by the evidence presented at trial and are not legally erroneous. See Little, 170 N.H. at 275. To the extent that the Association contends that a permissive use must be understood and accepted by the claimant, we note that it acknowledged at oral argument that there is no case authority in support of such a proposition.

Finally, the Association argues that the trial court erred in ruling that its use of Lot 12 was not exclusive from 1995 to 2015. Given, however, that we find no error in the trial court's ruling that the Association's use of Lot 12 was permissive, and thus not adverse, we need not address the question of exclusivity as the Association's adverse possession claim fails as a matter of law.

Affirmed.

LYNN, C.J., and HICKS and BASSETT, JJ., concurred.

7