Hillsborough—northern judicial district
No. 2003-676

KAREN AND FRANK FIGLIOLI

v.

R.J. MOREAU COMPANIES, INC.

Argued: October 13, 2004
Opinion Issued: January 6, 2005

*Thomas Craig, P.A.*, of Manchester (*Thomas Craig* on the brief and orally), for the plaintiffs.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Richard E. Mills* and *Danielle L. Pacik* on the brief, and *Mr. Mills* orally), for the defendant.

DALIANIS, J. The defendant, R.J. Moreau Companies, Inc. (Moreau), appeals a jury verdict in the Superior Court (*Brennan*, J.) for the plaintiffs, Karen and Frank Figlioli. The plaintiffs were awarded compensation for personal injuries resulting from the collapse of a deck built by the defendant. The defendant contends the trial court erred by (1) allowing the plaintiffs to pursue a claim for enhanced compensatory damages, (2) denying the defendant's motion for directed verdict on the enhanced compensatory damages claim, (3) allowing the plaintiffs to proceed with a claim under the Consumer Protection Act (CPA), RSA ch. 358-A (1995 & Supp. 2004), (4) allowing testimony by a general practice

surgeon regarding Karen Figlioli's neurological impairment, (5) allowing testimony regarding Karen Figlioli's lost earning capacity as a real estate agent and (6) allowing the plaintiffs to introduce evidence of uncontested construction defects. We reverse and remand for a new trial on the issue of damages.

The general facts and procedural history of this case are as follows: The plaintiffs purchased a lot from the defendant on May 28, 1997, on which the defendant built them a custom home with a second floor deck. The plaintiffs were on this deck on August 27, 2000, when it collapsed. Both plaintiffs suffered injuries; Karen Figlioli's injuries were more severe than her husband's.

The deck had two sources of support. The first consisted of exterior supports which extended diagonally from the far corners of the deck to connect to the side of the house. The second consisted of the points where the deck itself was attached to the house. After the collapse, an inspection revealed that the deck had been attached to the house with nails. It is uncontested that the deck should have been attached with lag bolts. The carpenter who built the deck, one of the defendant's employees, testified at trial that he forgot to put the lag bolts in the deck. This was the only evidence offered as to why there were no lag bolts in the plaintiffs' deck, although the defendant also offered evidence that an examination of all of the second story decks the defendant had built revealed only one other deck lacking lag bolts: a deck attached to the house next door to the plaintiffs' residence.

The plaintiffs filed a lawsuit against the defendant alleging breach of contract, breach of warranty, negligence, loss of consortium and a violation of the CPA, arising from the collapse of the deck and from other defects in the home. Prior to trial the parties settled all of the claims relating to property damage from the construction defects.

The plaintiffs continued their action for damages and economic loss due to the bodily injuries sustained in the collapse. They sought summary judgment on the issue of liability, which was granted on January 8, 2003. The remaining issues went to trial.

We first address the enhanced compensatory damages claim and the CPA claim. The defendant argues that the trial court should have ruled that both claims were procedurally barred, and therefore the plaintiffs should not have been allowed to proceed to trial on those claims. With respect to the CPA claim, this issue is moot, because at the close of the plaintiffs' case, the trial court granted a directed verdict for the defendant on the CPA claim, and the plaintiffs did not appeal the ruling. With respect

to the enhanced damages claim, we conclude that the trial court erred by not granting the defendant's motion for a directed verdict on the merits of this claim. Therefore, we need not address the argument regarding whether it was procedurally barred.

■ We will uphold a trial court's ruling on a motion for a directed verdict when the record supports the conclusion that the trial court did not commit an unsustainable exercise of discretion. *Dillman v. N.H. College*, 150 N.H. 431, 434 (2003). A trial court may grant a motion for a directed verdict only if it determines, after considering the evidence and construing all inferences therefrom most favorably to the non-moving party, that no rational juror could conclude that the non-moving party is entitled to any relief. *Id.* However, the plaintiffs may not avoid a directed verdict by presenting evidence that is merely conjectural in nature. Rather, the plaintiffs must present sufficient evidence to satisfy the burden of proof such that a reasonable jury could find in their favor. *Vautour v. Body Masters Sports Indus.*, 147 N.H. 150, 153 (2001).

■ When an act is wanton, malicious, or oppressive, the aggravating circumstances may be reflected in an award of enhanced compensatory damages. *Crowley v. Global Realty, Inc.*, 124 N.H. 814, 818 (1984). These enhanced compensatory damages, sometimes called liberal compensatory damages, *see Munson v. Raudonis*, 118 N.H. 474, 479 (1978), are awarded *only* in exceptional cases, and not even in every case involving an intentional tort. *Id.*; *Johnsen v. Fernald*, 120 N.H. 440, 442 (1980). We must examine the evidence presented at trial and determine whether a rational juror, construing all inferences most favorably to the plaintiffs, could have found evidence sufficient to support a claim for enhanced compensatory damages.

The plaintiffs assert that the testimony of their expert, Kris Larsen, was sufficient to support a claim for enhanced compensatory damages. Larsen, a general contractor, testified that in his opinion there was "gross negligence in the deviation of the fastening of the deck to the structure which allowed for and created a very hazardous unsafe condition." He testified that the manner of constructing the deck was in "gross disregard for the safety of the people using the deck." Larsen also testified that the deck would have remained intact if it had been lag bolted.

Larsen, however, had never met the carpenter who built the deck, and he had no firsthand knowledge of the construction. The only evidence that was presented as to why the deck was not lag bolted was the testimony of the carpenter, Jon Latares. Latares testified that he had intended to

replace the nails with lag bolts before he finished construction, but that he forgot to do so.

■ The plaintiffs argue that Latares' testimony was "simply not credible" and that "[a]rguably, it was not his forgetfulness but rather his usual practice that created this situation." Construing all of the evidence in the plaintiffs' favor, however, we find that no rational juror could conclude that the plaintiffs are entitled to relief on the claim for enhanced compensatory damages. In order to defeat the motion for a directed verdict, the plaintiffs were required to present evidence of wanton, malicious or oppressive conduct on the part of the defendant. The plaintiffs presented no evidence as to the reason their deck was not lag bolted except that the deck next door was not lag bolted either. The theories propounded by plaintiffs' counsel are not supported by anything more than conjecture.

In its denial of a directed verdict on the enhanced compensatory damages issue, the trial court relied upon *Schneider v. Plymouth State College*, 144 N.H. 458 (1999), finding little difference between the actions of the defendant college in *Schneider* and those of the defendant in this case. In *Schneider*, we upheld a verdict including enhanced compensatory damages because the defendant college failed "to investigate promptly and vigorously" allegations of sexual harassment. *Schneider*, 144 N.H. at 466. The defendant college had received multiple reports of sexual harassment from at least three professors at three different times, yet still failed to act. *Id.* at 460-61. The defendant college in *Schneider* repeatedly ignored reports from its own faculty that a student was being sexually harassed. The situation in *Schneider* is very different from this case, where the only evidence produced was that the defendant's employee forgot to lag bolt the deck.

The remaining issues concern events that took place at trial; we will address those issues that are likely to arise on remand. *Simpson v. Calivas*, 139 N.H. 1, 13 (1994).

The defendant next argues that the trial court erred by allowing Dr. Patrick Mahon to testify as to Karen Figlioli's neurological impairment and her whole person impairment, derived from the American Medical Association Guidelines (AMA Guidelines). Mahon is a general and vascular surgeon. He testified that general surgery is "a fairly broad area of surgery, ... complete management of trauma, abdominal surgery, endocrine surgery, head and neck surgery...." Vascular surgery "is the

surgery of the blood vessels, excluding the heart and excluding blood vessels in the brain . . . ."

Mahon was hired by the plaintiffs to assess the consequences of the injury to Karen Figlioli's spleen, evaluate the other medical reports, and determine her combined impairment assessment. He testified, using the AMA Guidelines, that Karen had a combined thirty-two percent whole person impairment, which he described as a measure of her decreased functioning as a person. Mahon testified that he had never used the AMA Guidelines prior to this case.

He was also asked to give his opinion on the extent of Karen's neurological impairment. Mahon is not a neurologist and claimed no expertise in the field of neurology, but he testified that Karen had a fourteen percent neurological impairment. The defendant argues that Mahon lacked the education and experience to qualify him as an expert in either of these matters. We agree.

New Hampshire Rule of Evidence 702 states that an expert may be qualified on the basis of "knowledge, skill, experience, training, or education." N.H. R. Ev. 702. We will reverse a trial court's determination of expert qualification if we find it to be an unsustainable exercise of discretion. *Baker Valley Lumber v. Ingersoll-Rand*, 148 N.H. 609, 612 (2002).

Although a medical degree does not automatically qualify a witness to give an opinion on every conceivable medical question, neither does the lack of specialization in a particular medical field automatically disqualify a doctor from testifying as an expert in that field. An individual witness's qualifications must be determined on a case-by-case basis, not by application of a *per se* rule of exclusion or inclusion. *Mankoski v. Briley*, 137 N.H. 308, 313 (1993).

We have allowed experts to testify about a field beyond their specific training when they have experience adequate to render them an expert in that field. In *Mankoski*, for example, the plaintiff's attorney made an adequate offer of proof that the expert, an orthopedic specialist, had medical training in the diagnosis of depression, had treated many patients with orthopedic problems who developed depression as a result of those problems, and was able to diagnose and treat depression. *Id.* at 311-12, 313. We ruled that the trial court erred by ruling the expert *per se* unqualified. *Id.* at 313. In *Hodgdon v. Frisbie Memorial Hospital*, we held it was not an unsustainable exercise of discretion for the trial court to qualify an ophthalmologist as an expert in emergency room care, when he testified that he instructed emergency room physicians in the care of

emergency ophthalmic conditions, and could provide testimony as to what an emergency room physician is expected to do in a given situation. *Hodgdon v. Frisbie Mem. Hosp.*, 147 N.H. 286, 289-90 (2001); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

The plaintiffs argue that Mahon was qualified to give the neurological and whole person impairment ratings on two bases: his own findings, and his review of another expert's conclusions under Rule 703. However, unlike the witnesses whose qualifications were at issue in *Mankoski* and *Hodgdon*, Mahon offered *no* evidence supporting his qualifications to make a neurological impairment assessment, or to give a whole person impairment rating using the AMA Guidelines.

He testified that he had no neurological training or experience. Unlike *Mankoski*, there was no evidence Mahon frequently worked with patients who had neurological injuries. Unlike *Hodgdon*, there was no evidence that Mahon had neurology experience stemming from his role as an instructor. In short, Mahon provided no reason why he was entitled to offer an opinion in the field of neurology.

■ As for the whole person impairment under the AMA Guidelines, Mahon testified he had never before used the AMA Guidelines. His testimony revealed he was unfamiliar with terms in the AMA Guidelines, and that he was unfamiliar with the standards and criteria employed under the AMA Guidelines to make impairment determinations. He testified that, in determining Karen Figlioli's impairment in "community activities," one of the six criteria found in the AMA Guidelines, he did not know which community activities qualified for consideration, *nor did he look them up*. In sum, Mahon was not qualified to give an expert opinion either on Karen Figlioli's neurological impairment or on her whole person impairment under the AMA Guidelines based upon his own findings.

We also find that Mahon was not qualified to testify as an expert through review of another expert's findings under Rule 703. N.H. R. EV. 703. Rule 703 provides that the basis for expert testimony may be facts or data "perceived by or made known to the expert at or before the hearing." *Id.* Further, "the facts or data need not be admissible in evidence." *Id.* While an expert may rely upon inadmissible evidence to form an expert opinion, the basis for the conclusion is assumed to lie in his or her special knowledge of such matters. *See Brown v. Bonnin*, 132 N.H. 488, 494 (1989).

█ Mahon relied upon a report written by Dr. William Jamieson, a neuro-psychologist who testified at trial. Jamieson was not permitted to testify as to the level of Karen Figlioli's whole person impairment using the AMA Guidelines because he was not properly disclosed as an expert for that purpose. As noted above, Mahon had no special knowledge in the field of neurology, and lacked any experience in using the AMA Guidelines. In essence, his reliance upon Jamieson's report was merely a repetition of findings that Jamieson had made, but was not permitted to disclose. Therefore, Mahon's testimony was an attempt to circumvent the court's ruling prohibiting Jamieson from testifying to the same effect. This does not fit the confines of Rule 703. *See Bonnin*, 132 N.H. at 493-94 (expert's proposed testimony not admitted under Rule 703 when it was not his own opinion but mere repetition of another's statements).

The plaintiffs also argue that the ease of use of the AMA Guidelines indicates that Mahon used the AMA Guidelines correctly. We find this argument without merit and warranting no further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

Next, we address whether the trial court erred by allowing Peter Clarke to testify as to Karen Figlioli's lost earning capacity as a real estate agent. Peter Clarke, a vocational rehabilitation consultant, testified for the plaintiffs regarding their lost earning capacity as a result of the accident. Clarke performed a vocational assessment of both plaintiffs. Prior to the accident, Karen Figlioli was a full-time mother with four young children living at home. Clarke's original report was dated January 16, 2003. It included calculations for lost earnings based upon possible jobs she could have had before the accident: child care worker, personal and homecare aide, cashier, retail salesperson, cook, cafeteria worker, food preparation worker and receptionist. The report then compared earnings from those jobs to possible jobs she was capable of holding after the accident: cashier, retail salesperson, cook, cafeteria worker and food preparation worker.

On April 25, 2003, ten days after the discovery deadline had passed, Clarke filed an addendum to his original report, in which he detailed earnings lost based upon Karen Figlioli's hypothetical future career as a real estate agent. In his addendum, he asserted that she had mentioned her desire to become a real estate agent in his initial interview. Prior to trial, the defendant filed a motion to preclude Clarke's testimony relative to his supplemental report because it was untimely. This motion was denied.

At trial, in addition to testifying about possible positions she could have held prior to the deck collapse, Clarke testified as to her actual past work

experience: part-time work as a billing clerk, full-time homemaker who had raised five children, operating a snow-plow, and a small cat care business. He also testified as to her lost wages of between $22,450 and $24,240 per year, based upon a future position as a real estate agent. The plaintiffs introduced evidence at trial that before the deck collapse, she failed a Massachusetts real estate salesperson exam in 1987, though she received a passing score on one section of the test. On March 15, 2003, after the deck collapse, she failed the New Hampshire Real Estate Examination.

The reasoning behind the trial court's order allowing Clarke to testify relative to his supplemental report is missing from the record. The plaintiffs argue that the defendant was timely notified of their position regarding Karen Figlioli's ability to work as a real estate agent through the report of Dr. William Burke, a life-care planner who testified at trial as an expert on rehabilitation and disability management. Indeed, one sentence, in the middle of a paragraph on page seven of a nine-page report submitted by Burke reads: "Her goal of becoming licensed as a Real Estate Agent can be ruled out secondary to her impaired attention, memory and learning." The plaintiffs argue that since the defendant was aware of the substance of Clarke's supplemental report from another source, its late disclosure should be excused.

We have long recognized that justice is best served by a system that reduces surprise at trial by giving both parties the maximum amount of information. A party is thus entitled to disclosure of an opposing party's experts, the substance of the facts and opinions about which they are expected to testify, and the basis of those opinions. A party's failure to supply this information should result in the exclusion of expert opinion testimony unless good cause is shown to excuse the failure to disclose. *Wong v. Eckberg*, 148 N.H. 369, 372 (2002). We review a trial court's decision on the management of discovery and the admissibility of evidence under an unsustainable exercise of discretion standard. To meet this standard, the defendant must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. *State v. Amirault*, 149 N.H. 541, 543 (2003).

It is true that the defendant was aware, from Burke's disclosure, that evidence would be presented at trial that Karen Figlioli had always wanted to be a real estate agent, and that she was no longer capable of achieving that goal. However, the defendant was not aware until after the close of discovery that this evidence would come from a vocational rehabilitation

consultant and would include a dollar value. The defendant was only aware that Burke, the life-care planner, would testify regarding this subject.

As the plaintiffs point out in their brief, Clarke's supplemental report "ratif[ied] and put a dollar figure to the real estate earning impairment" cited by Burke. The evidence that Karen Figlioli wanted to become a real estate agent, and now was unable to do so, was admitted from other sources, including her own testimony.

■ The plaintiffs have not shown good cause why Clarke's supplemental report was disclosed past the discovery deadline. Allowing Clarke to testify as to the subject matter disclosed in the supplemental report was an unsustainable exercise of discretion by the trial court.

The final issue on appeal is whether the trial court erred by allowing the introduction of evidence of other defects in the construction of the house to prove that Karen Figlioli's mental ability was intact prior to the accident. This evidence was offered to rebut evidence offered by the defendant that she had difficulties with attention and comprehension prior to the accident. Karen Figlioli's mental ability, both before and after the accident, was an issue at trial because the plaintiffs claimed she suffered permanent neurological impairment. The plaintiffs presented the testimony of three of her sisters as to what she was like before and after the accident. The plaintiffs also presented expert testimony from Jamieson, Burke, Mahon and Clarke as to her difficulty paying attention and concentrating after the accident.

The defendant presented the testimony of Jon Lariviere about his interactions with Karen Figlioli during the house design and construction process. Lariviere testified that he met with her between eighteen and twenty-five times during the design and construction process. He testified that he had to explain things to her repeatedly, that she had a hard time comprehending the effect of some of the design changes she wanted, and, specifically, that she had difficulty understanding that the plywood covering the window frames was only a temporary precaution during the construction period. Lariviere also testified that, prior to the accident, she exhibited many of the traits Jamieson and Burke identified as being a result of the accident.

The plaintiffs argued that this testimony "opened the door" for evidence of other construction defects. Prior to trial, the trial court had ruled that evidence of the other defects, which were the object of the parties' property damage and economic loss settlement, was inadmissible; however, the trial court now agreed with the plaintiffs and held that they

could use evidence of *other defects* to show that Karen Figlioli was not "always inconsistent, she is not stupid, she saw something that was wrong and she pointed it out." As a result, the plaintiffs asked Lariviere questions about twenty-one separate and distinct defects found in the house after the closing date. No evidence was offered that Karen Figlioli discovered these defects.

[7] We will not reverse a trial court's ruling on the admissibility of evidence absent an unsustainable exercise of discretion. *State v. Cannon*, 146 N.H. 562, 564 (2001); *cf. Lambert*, 147 N.H. at 296. "Opening the door" occurs when one party introduces evidence that provides a justification beyond mere relevance for an opponent's introduction of otherwise inadmissible evidence. By means of this mechanism, a misleading advantage may be countered with previously suppressed or otherwise inadmissible evidence. *State v. Fecteau*, 133 N.H. 860, 874 (1991). The fact that the door has been opened does not, by itself, permit all evidence to pass through, but when a party leaves the trier of fact with a false or misleading impression, the opposing party is entitled to counter with evidence to refute the impression created and cure the misleading advantage. *State v. Blackstock*, 147 N.H. 791, 797 (2002).

In this case, there was no misleading advantage that needed countering. The plaintiffs presented days of expert testimony as to Karen Figlioli's mental condition. This evidence was supplemented by the lay testimony of three of her sisters, who knew her both before and after the accident, knew her much better than Lariviere, and testified as to their personal observations of how her behavior had changed. The defendant offered Lariviere's observations of her before the accident as an attempt to rebut this evidence.

A review of the record reveals that the defendant did not take the position that Karen Figlioli was concerned about mistakenly identified defects, as suggested by the trial court. Rather, the defendant argued that she displayed difficulty with attention and comprehension prior to the accident. Lariviere offered the issue of the window frames as an example to illustrate that she had difficulty understanding *his explanation* of why the window frames appeared so small. It was undisputed that the window frames, when covered with plywood, were, in fact, smaller. Lariviere's testimony concerned the difficulty he had in explaining to her that the plywood was just a temporary precautionary measure.

Since the defendant did not raise the issue of the window frames as an example of a mistakenly identified defect, the evidence of other

correctly identified defects is irrelevant. Further, as there was no proof offered that Karen Figlioli herself discovered the actual defects, evidence of the actual defects does not tend to show her mental acuity. The trial court must have found the evidence was prejudicial to the defendant, since it granted the defendant's initial motion to preclude its introduction at trial; therefore, we hold that allowing the plaintiffs to introduce the evidence of these defects was an unsustainable exercise of discretion.

We remand this case for a new trial on the issue of damages only. In doing so, we note that discovery is closed. The testimony of Clarke relative to his supplemental report must be excluded from the retrial, as it was not disclosed by the discovery deadline. We also note that the issue of the CPA claim has been adjudicated and was not appealed. As the CPA claim and the enhanced compensatory damages claim are no longer at issue, the testimony of expert Kris Larsen will not be admissible at the retrial.

*Reversed and remanded.*

BRODERICK, C.J., and NADEAU and GALWAY, JJ., concurred.