Rockingham
No. 2004-820

LOIS STEWART, ADMINISTRATOR OF THE ESTATE OF VICKI LYNN BADER

v.

SETH BADER

Argued: April 6, 2006
Opinion Issued: August 22, 2006

*Borofsky, Amodeo-Vickery & Bandazian, P.A.*, of Manchester (*Stephen E. Borofsky* and *Erica Bodwell* on the brief, and *Mr. Borofsky* orally), for the plaintiff.

*B. Michael Cormier*, of Haverhill, Massachusetts, by brief and orally, for the defendant.

DALIANIS, J. The defendant, Seth Bader, appeals the judgment entered by the Superior Court (*McHugh*, J.) in favor of the plaintiff, Lois Stewart, Administrator of the Estate of Vicki Lynn Bader, in the plaintiff's tort action. We affirm.

The trial court found the following facts. In May 1998, a jury convicted the defendant of first-degree murder. *See State v. Bader*, 148 N.H. 265, 267 (2002), *cert. denied*, 538 U.S. 1014 (2003). Specifically, the jury found that, on August 24, 1996, the defendant purposely caused the death of his

former wife, Vicki Bader, by shooting her in the head. The defendant was sentenced to life in prison without the possibility of parole.

The defendant married Vicki in May 1991. In August 1993, she gave birth to the couple's child, Samuel. The couple later adopted the defendant's cousins, Joseph and Matthew. In May 1994, the defendant sought a divorce, which became final a month later.

In January 1995, Vicki attempted suicide. While she was hospitalized, the defendant requested and was granted custody of the children. The defendant then engaged in a series of acts intended to remove the children from Vicki and alienate them from her. For instance, he engaged in repeated legal attacks that ultimately resulted in the court reducing Vicki's visitation with her baby to seven hours of supervised visitation per week. In addition, he sought to alienate Joseph and Matthew from her. He repeatedly told Joseph that Vicki was "fat" and "stupid."

Beginning in February 1995, the defendant perpetrated a number of other acts, intended to provoke Vicki to commit suicide. For instance, he terminated payments to her treating psychiatrist, which cut off her access to psychiatric help and stopped paying her financial support, which cut off her access to legal help. In March, April and May 1995, he directed his son, Joseph, to write and mail "hate" letters to her. In June 1995, Vicki again attempted suicide.

In January 1996, the defendant told Vicki that he would consider sharing custody of the children with her if she would discontinue her legal efforts to obtain custody. When she refused, he directed Joseph to go to her home and roast her two pet parakeets in the oven. Other acts for which the defendant was responsible included: having Vicki's car scratched and its tires slashed on February 14, 1996; on that same day, having the windows of her home shot out with a BB gun; and, at the end of April 1996, having an unknown man come to Vicki's home to tell her that "she would not live long enough to get custody of her baby."

In August 1996, the defendant killed Vicki by shooting her in the head with a .22 caliber gun. He was not arrested until April 12, 1997, after her body had been discovered in a remote wooded grave in Maine. Two days after the defendant's arrest, the plaintiff filed two lawsuits against him. In one action, the plaintiff sought damages for Vicki's wrongful death. The plaintiff later amended this action to seek enhanced compensatory damages and damages for intentional, reckless or negligent infliction of emotional distress. In the other action, the plaintiff sought to attach the defendant's assets. The two cases were consolidated. Following a bench trial, the court awarded the plaintiff $500,000 on her emotional distress claims; this award included enhanced compensatory damages. On her wrongful death claim, the court awarded $2,190,544 in compensatory

damages and $2,190,544 in enhanced compensatory damages, for a total damage award of $4,881,088.

On appeal, the defendant challenges several of the trial court's rulings during the course of this litigation. He argues that the trial court erred when it: (1) denied his motion to unseal the case file; (2) ruled that he could not have access to the plaintiff's contingency fee agreement; (3) ruled that his murder conviction collaterally estopped him from arguing that he did not murder Vicki; (4) denied his motion for summary judgment upon the plaintiff's intentional infliction of emotional distress claim; (5) failed to sever the plaintiff's wrongful death and intentional infliction of emotional distress claims; (6) granted summary judgment to the plaintiff with respect to his liability for enhanced compensatory damages based upon his murder conviction; (7) awarded excessive damages to the plaintiff; and (8) denied him his homestead exemption, *see* RSA 480:1 (Supp. 2005). We address each argument in turn.

## I. Motion to Unseal

The defendant first argues that the trial court erred when it denied his motion to unseal the case file. He asserts that this order deprived him of his constitutional right to a public trial. *See* U.S. CONST. amend. VI; N.H. CONST. pt. I, art. 15.

The Federal Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. The Sixth Amendment confers the right to a public trial only upon a defendant and only in a criminal case. *Gannett Co. v. DePasquale*, 443 U.S. 368, 387 (1979). Our State Constitution does not contain a similar clause, but Part I, Article 15 has been held to guarantee a criminal defendant's right to a public trial. *See State v. Weber*, 137 N.H. 193, 196 (1993).

We decline the defendant's invitation to recognize such a right in this civil matter given his failure to cite *any* authority for the proposition. "[I]n the realm of appellate review, a mere laundry list of complaints regarding adverse rulings by the trial court, without developed legal argument, is insufficient to warrant judicial review." *Douglas v. Douglas*, 143 N.H. 419, 429 (1999) (citation omitted); *see Keenan v. Fearon*, 130 N.H. 494, 499 (1988) ("offhand invocations" of constitutional rights supported by neither argument nor authority warrant no extended consideration).

## II. Contingency Fee Agreement

The defendant next asserts that the trial court erred when it denied him access to the plaintiff's contingency fee agreement. He contends that

because the agreement was not subject to the attorney-client evidentiary privilege, the court erred by denying him access to it.

The record shows that the plaintiff filed her contingency fee agreement with the court pursuant to RSA 508:4-e, III (1997) (repealed 2002). In February 2002, the defendant moved to unseal the case file, including the contingency fee agreement. The trial court denied this motion in April 2002 on the ground that RSA 508:4-e, III was unconstitutional. We declined the defendant's interlocutory appeal of this ruling.

The defendant then sought access to the contingency fee agreement in a series of pretrial motions, which either the trial court denied or upon which it declined to rule. In these pretrial motions, the defendant argued that he was entitled to access to the agreement, in part, because it was not protected by the attorney-client privilege.

We review the trial court's rulings under our unsustainable exercise of discretion standard. "To meet this standard, the defendant must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case." *Figlioli v. R.J. Moreau Cos.*, 151 N.H. 618, 626 (2005).

■ The defendant argues that had the court allowed him access to the plaintiff's contingency fee agreement, he would have used it to argue that "the tort action amounted to looting of the children's assets by attorneys who did not represent the children." As the plaintiff aptly observes, this argument "was not relevant or material to any question or element that had to be proved in the case," and thus, depriving the defendant of this argument did not constitute prejudice. Because the defendant has failed to demonstrate that the trial court's rulings were "clearly untenable or unreasonable to the prejudice of his case," we hold that the court sustainably exercised its discretion. *Id.*

## III. Collateral Estoppel Effect of Criminal Conviction

The defendant next contends that the trial court erred when it ruled that, under the doctrine of collateral estoppel, his murder conviction precluded him from arguing that he did not murder Vicki. He asserts that his conviction cannot have preclusive effect because: (1) he chose not to testify at his criminal trial; and (2) one of the prosecution's key witnesses has since, allegedly, recanted.

### A. Preservation of Argument Concerning Decision Not to Testify

We first briefly address the plaintiff's assertion that the defendant did not preserve his argument that his conviction lacked preclusive effect because he did not testify at his criminal trial. Specifically, the plaintiff

contends that the defendant did not preserve this issue because he never made an offer of proof as to what he would have testified had he chosen to do so.

The plaintiff is mistaken. The defendant's argument does not depend upon what his testimony would have been. Rather, in effect, he asserts that because he chose not to testify, he was denied a fair trial and, therefore, his criminal conviction cannot have preclusive effect. The content of the testimony he would have given at the criminal trial is immaterial to this assertion.

Moreover, as the affidavit attached to his opposition to the plaintiff's summary judgment motion makes clear, the defendant *did* make an offer of proof with respect to the evidence he would produce if his conviction did not have collateral estoppel effect in the civil trial. In that affidavit, he averred:

> My conviction for murdering and conspiring to murder my ex-wife . . . was based on perjured testimony which was recklessly or knowingly presented by prosecutors. In fact, I am completely innocent of those crimes. I believe that those crimes, as well as the harassing and threatening acts directed at Vicki before her death, were perpetrated by a person or persons acting in concert with my ex-fianc[é]e, Mary Jean Martin.
>
> . . . I can prove the statements in the above paragraph through the testimony of a witness known as "John Doe" and through discovery I am seeking in my federal habeas corpus proceeding.

No more was required of him to preserve this issue for our review. *See* N.H. R. Ev. 103(b)(2).

### B. Merits of Defendant's Collateral Estoppel Arguments

"Spurred by considerations of judicial economy and a policy of certainty and finality in our legal system, the doctrines of res judicata and collateral estoppel have been established to avoid repetitive litigation so that at some point litigation over a particular controversy must come to an end." *Cook v. Sullivan*, 149 N.H. 774, 777 (2003) (quotation omitted). The doctrine of collateral estoppel bars a party to a prior action, or a person in privity with such a party, from relitigating any issue or fact actually litigated and determined in the prior action. *Id.* at 778.

For collateral estoppel to apply, three basic conditions must be satisfied: (1) the issue subject to estoppel must be identical in each action; (2) the first action must have resolved the issue finally on the merits; and (3) the party to be estopped must have appeared as a party in the first

action, or have been in privity with someone who did so. *Id.* "These conditions must be understood, in turn, as particular elements of the more general requirement, that a party against whom estoppel is pleaded must have had a full and fair prior opportunity to litigate the issue or fact in question." *Id.* (quotation omitted).

The defendant asserts two reasons why his criminal conviction should not have collateral estoppel effect in this civil proceeding. First, he contends that his conviction has no preclusive effect because he did not testify at his criminal trial. In effect, he argues that because he chose not to testify at his criminal trial, he was deprived of a full and fair opportunity to litigate his guilt or innocence. We disagree.

In *Hopps v. Utica Mutual Insurance Co.*, 127 N.H. 508, 511 (1985), we held that given modern concepts of collateral estoppel:

> there is no reason in principle why an earlier criminal judgment should not preclude a party to the criminal prosecution from relitigating an issue of fact in a later civil proceeding, if that party enjoyed a full and fair opportunity to litigate the issue in the first instance. In fact, there is a stronger rationale for applying collateral estoppel against a former criminal defendant than for applying it against a party to a prior civil case, since the criminal defendant has had the benefit of the presumption of innocence and the State's obligation to prove any fact essential to the conviction beyond a reasonable doubt.

Thus, in that case, we elected to "follow the Restatement (Second) of Judgments § 85(2)(a) (1982) in holding as a general rule that a judgment in favor of the prosecuting authority in an earlier prosecution is preclusive in favor of a third person in a later civil action against the defendant in the criminal prosecution." *Hopps*, 127 N.H. at 511 (quotation, brackets and ellipses omitted).

We carved out one exception to this general rule, however, and intimated that "the overriding requirement of a fair opportunity to litigate" made it possible that we would recognize other exceptions in the future. *Id.* Because collateral estoppel requires that "the issue to which preclusion applies must have been contested and actually litigated in the prior action," we held that "a plea of *nolo contendere* ... will raise no estoppel, since that plea neither controverts nor confesses the facts upon which the conviction must rest." *Id.* We indicated that, in future cases, we would look to RESTATEMENT (SECOND) OF JUDGMENTS §§ 28, 29 (1982) for the equitable factors that we might consider to limit the preclusive effects of an earlier criminal judgment upon a later civil action. *Id.* at 511-12. In

this vein, we specifically reserved judgment "on the significance of a defendant's choice not to testify in the criminal action." *Id.* at 512.

Since deciding *Hopps* more than twenty years ago, we have not had the opportunity to revisit this issue. Although the defendant in *Aubert v. Aubert*, 129 N.H. 422, 428 (1987), argued that collateral estoppel should not apply to her prior conviction because she did not testify at her criminal trial, we did not address the argument because she failed to preserve it.

A handful of courts in other jurisdictions have addressed the issue, and have all decided that a criminal defendant's decision not to testify at his criminal trial does not deprive him of a full and fair opportunity to litigate the issues in that trial. *See State Farm Fire and Cas. Ins. Co. v. Kane*, 715 F. Supp. 1558, 1560-61 (S.D. Fla. 1989); *Dettmann v. Kruckenberg*, 613 N.W.2d 238, 243-44, 249 (Iowa 2000); *cf. Seddon v. Bonner*, 755 A.2d 823, 824, 827-28 (R.I. 2000) (victim's rights statute, which provides for automatic entry of civil judgment against criminal defendant upon final conviction of felony after jury trial, does not violate due process rights of defendant who does not testify at criminal trial; defendant had opportunity to testify, but elected not to do so).

*Dettmann*, for instance, concerned a wrongful death action brought by the victim's estate against, among other people, the teenager who had been convicted of vehicular homicide in connection with the victim's death. In the civil action, the teenager sought to deny that he was driving the vehicle when it collided with the victim's vehicle and to claim that another person had driven the vehicle at the time of the accident. *Dettmann*, 613 N.W.2d at 242. The trial court ruled that the teenager's prior criminal conviction precluded him from litigating the identity of the driver in the civil action. *Id.*

The Supreme Court of Iowa affirmed. *Id.* at 241. The court first held that a criminal conviction could have collateral estoppel effect when offered against the criminal defendant in a later civil proceeding. *Id.* at 248. The court then ruled that collateral estoppel applied in this particular case to preclude the teenager from relitigating the issue of who was driving the vehicle at the time of the accident. *Id.* The court was unpersuaded by the teenager's argument that, because he elected not to testify, he did not have a full and fair opportunity to litigate this issue. *Id.* at 249. The court reasoned that the teenager decided not to testify, presumably, because he assumed that he would benefit from this choice. *Id.* "Any error in this trial strategy, however, no more defeats the preclusive effect of his criminal conviction in the civil case than the failure of a litigant to introduce relevant available evidence in any other situation." *Id.*

In *Kane*, a federal court in Florida reached a similar conclusion. In that case, the defendant had been convicted of arson. *Kane*, 715 F. Supp. at 1559. In a later civil action, the insurer argued that the defendant's conviction precluded him from litigating whether he had intentionally set the fire. *Id.* at 1560. The court rejected the defendant's argument that he had not yet had a full and fair opportunity to litigate the issue of what caused the fire because he elected not to testify at his criminal trial. *Id.* at 1560. The court noted that, although the defendant had the right to refuse to take the stand in his own defense, and although he could not be penalized for choosing to exercise this right, he could not invoke this right to argue that he was deprived of a full and fair opportunity to defend himself. *Id.* at 1560-61. As the court stated: "He defended himself by utilizing the best trial strategy that he and his attorney could devise. He cannot now claim that, because he lost, he was denied a full and fair hearing on the merits." *Id.*

■ We agree with the courts that have considered the issue and hold that the defendant's decision not to testify at his criminal trial on a charge of first-degree murder did not deprive him of the full and fair opportunity to litigate issues in that trial. "[I]n light of the criminal sanctions that he faced, [he] had every incentive to defend the prosecution vigorously and to take an appeal, which he did." *Aetna Cas. & Sur. Co. v. Niziolek*, 481 N.E.2d 1356, 1361 (Mass. 1985) (citation omitted); *see also Bader*, 148 N.H. at 267. He has not argued that the prosecution somehow impermissibly prevented him from testifying on his own behalf, only that he chose not to do so. Under these circumstances, we conclude that his failure to testify did not deprive him of a full and fair opportunity to litigate the issues at his criminal trial.

The defendant's second reason for contending that his conviction has no preclusive effect is because a significant prosecution witness has since, allegedly, recanted his testimony. In effect, the defendant argues that his conviction should not have preclusive effect because he is actually innocent of the crime for which he was convicted. This argument turns the collateral estoppel doctrine on its head. Although he asserts that this "newly discovered" evidence proves his actual innocence, this court and the United States District Court for the District of New Hampshire have both rejected this very argument.

The "newly discovered" evidence to which the defendant alludes concerns the alleged recantation by Sandro Stuto, a prosecution witness. During the trial, Stuto testified that he was present, in the role of backup shooter, when the defendant murdered Vicki. *Bader*, 148 N.H. at 281. He also testified that he disposed of Vicki's motor vehicle after the murder

and that, for these acts, the defendant's former fiancée, Mary Jean Martin, paid him $6,000. *Id.*

After his conviction, the defendant learned that Stuto had allegedly recanted his testimony to a prison inmate, referred to as "John Doe." *Id.* In his affidavit, "John Doe" averred that Stuto had informed him that "Mary Jean Martin enlisted his assistance to kill Vicki Bader and that Seth Bader did not have anything to do with killing his ex-wife." *Id.* (quotation omitted).

In *Bader*, we considered, at length, whether this "newly discovered" evidence entitled the defendant to a new trial. We upheld the trial court's determination that this evidence did not entitle him to a new trial, in part, because it was merely cumulative of other evidence the jury considered. *Id.* at 282-83. We also upheld the trial court's determination that the "newly discovered" evidence was of such a character that a different result probably would not be reached in another trial. *Id.* at 283-84. We specifically rejected his assertion that the John Doe affidavit, detailing Stuto's alleged recantation, is evidence of Stuto's perjury and that the defendant is, therefore, actually innocent. *Id.* at 283. We also rejected his assertion that, by failing to grant his motion for a new trial or to conduct an evidentiary hearing in light of the newly discovered evidence, the trial court violated his federal due process rights. *Id.* at 282, 284-87. Although the defendant sought certiorari review of our decision, the United States Supreme Court denied his petition. *See Bader v. New Hampshire*, 538 U.S. 1014 (2003).

The defendant raised virtually the same arguments in two federal habeas petitions. *See Bader v. Warden*, No. Civ. 02-508-JD, 2003 WL 21228520, at *11-*13 (D.N.H. May 28, 2003); *Bader v. Warden, New Hampshire*, No. Civ. 02-CV-508-JD, 2005 WL 1528761 (D.N.H. June 29, 2005). In his first such petition, the defendant contended that his due process rights were violated because Stuto perjured himself at trial and the State recklessly overlooked this perjury. *Bader*, 2003 WL 21228520, at *12. The federal district court denied the defendant's petition for habeas relief. *Bader*, 2003 WL 21228520, at *13-*14.

In his second federal habeas petition, in addition to other arguments, the defendant asserted that the State knowingly or with reckless indifference to the truth, tolerated Stuto's perjury. *See Bader*, 2005 WL 1528761, at *1, *4. Again, his claim was rejected. *Bader*, 2005 WL 1528761, at *4-*5.

■ Although, in the instant appeal, the defendant asserts that "some jury—civil or criminal—should have the opportunity to consider the credibility and weight of prosecution witness Stuto's recantation," the fact is that the original trial court, this court and the federal district court have

all considered, and rejected this assertion. To accept the defendant's argument would require us to deny preclusive effect not only to his criminal conviction, but also to our decision in his direct appeal of his conviction as well as decisions of the New Hampshire federal district court upon his petitions for federal habeas review. Simply put, despite his assertion that he is actually innocent of the crime for which he was convicted, unless and until his conviction is overturned, it is deemed valid and is entitled to preclusive effect under the collateral estoppel doctrine. *Cf. Therrien v. Sullivan*, 153 N.H. 211, 214 (2006) (defendant may not collaterally attack criminal conviction in subsequent criminal legal malpractice action unless he has been exonerated of crime via direct appeal or post-conviction relief).

## IV. Defendant's Entitlement to Summary Judgment

The defendant next argues that the trial court erred when it denied his motion for summary judgment upon the plaintiff's intentional infliction of emotional distress claim. He asserts that he was entitled to summary judgment because the plaintiff failed to file an opposing affidavit. *See* RSA 491:8-a, II, IV (1997).

In reviewing a denial of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *Van Der Stok v. Van Voorhees*, 151 N.H. 679, 681 (2005). "If no genuine issue of material fact existed, and the moving party was entitled to judgment as a matter of law, then summary judgment should have been granted." *Id.*

RSA 491:8-a, II provides, in pertinent part, that the party moving for summary judgment must accompany its motion with an "affidavit based upon personal knowledge of admissible facts as to which it appears affirmatively that the affiants will be competent to testify." This provision further provides that:

> The facts stated in the accompanying affidavits shall be taken to be admitted for the purpose of the motion, unless within 30 days contradictory affidavits based on personal knowledge are filed or the opposing party files an affidavit showing specifically and clearly reasonable grounds for believing that contradictory evidence can be presented at a trial but cannot be furnished by affidavits.

RSA 491:8-a, II.

 The record shows that the defendant was not entitled to summary judgment because his *own* affidavit revealed genuine issues of material

fact. *See Hopkins v. Fleet Bank - NH*, 143 N.H. 385, 390 (1999). His affidavit demonstrated that there was a dispute as to whether he was responsible for the so-called "terror campaign" waged against Vicki. Although he averred that he was not responsible for it, he alerted the court to several witnesses who testified that he was responsible, thus revealing a disputed issue of material fact. Because the defendant, as the moving party, did not meet his burden of showing that there were no genuine issues of material fact, the plaintiff, as the opposing party, was not required to rebut his showing. *See id.*

## V. Failure to Sever Two of Plaintiff's Claims

■ The defendant next asserts that the trial court erred by not severing the plaintiff's wrongful death and intentional infliction of emotional distress claims. Determinations of whether to bifurcate a case or sever the issues before the court are committed to the trial court's sound discretion. *See Blevens v. Town of Bow*, 146 N.H. 67, 72 (2001). "The manner and timing of the trial of all or part of the issues in an action is a question of justice and convenience within the discretion of the trial judge, whose findings will not be disturbed" absent an unsustainable exercise of discretion. *Id.* (quotation and brackets omitted); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

The defendant argues that severance was required because: "By trying the wrongful death and emotional [distress] issues, the Superior Court was asking a trier of fact to simultaneously impose a fine on a convicted murderer and keep an open mind as to whether that convicted murder[er] might have harassed his victim before murdering her." The defendant's speculation about "[t]he obvious difficulty of th[is] mental feat" is insufficient to establish that the trial court, which was the trier of fact in this case, unsustainably exercised its discretion by failing to sever the two claims. "We cannot base a finding that the trial court [unsustainably exercised] its discretion upon mere speculation." *Bohan v. Ritzo*, 141 N.H. 210, 218 (1996) (quotation omitted).

The defendant observes that, in *State v. Ramos*, 149 N.H. 118, 127-28 (2004), the court adopted a "new, severance-friendly standard in criminal cases"; he urges the court to apply this standard to civil cases. In *Ramos*, 149 N.H. at 127, we adopted the American Bar Association standards for joinder and severance of criminal offenses for trial, which allow for joinder in all cases, but grant either the defense or prosecution "the absolute right to sever unrelated cases." We decline to address the defendant's argument that we should extend *Ramos* to civil cases because it is not fully developed. *See In the Matter of Thayer and Thayer*, 146 N.H. 342, 347

(2001). The defendant has not only failed to apply *Ramos* to this case, but he also has failed to provide any policy justification or case authority to support his assertion that we should extend *Ramos* to joinder and severance of civil claims.

## VI. Enhanced Compensatory Damages

### A. Summary Judgment as to Liability

The defendant next contends that the trial court erroneously granted summary judgment to the plaintiff as to his liability for enhanced compensatory damages based upon his murder conviction. We will affirm a trial court's grant of summary judgment if, considering the evidence and all inferences properly drawn therefrom in the light most favorable to the non-movant, our review of that evidence discloses no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Coyle v. Battles*, 147 N.H. 98, 100 (2001). We review the trial court's application of the law to the facts *de novo. Id.*

"When an act is wanton, malicious, or oppressive, the aggravating circumstances may be reflected in an award of enhanced compensatory damages." *Figlioli*, 151 N.H. at 625. These enhanced compensatory damages, sometimes called liberal compensatory damages, are awarded only in exceptional cases. *Id.* "The mere fact that an intentional tort is involved is not sufficient; there must be 'ill will, hatred, hostility, or evil motive on the part of the defendant.'" *Aubert*, 129 N.H. at 431 (quotation omitted).

Here, there is no disputed issue of material fact regarding the defendant's conduct. The defendant was convicted in his criminal trial of first-degree murder. The jury found him guilty of "purposely caus[ing] the death of Vicki Bader." In this context, "purposely" means that his "conscious object [was] the death of another" and that his acts to further that object "were deliberate and premeditated." RSA 630:1-a, II (1996). We hold that this conduct, as a matter of law, was wanton, malicious and oppressive and therefore justified an award of liberal compensatory damages. *See Aubert*, 129 N.H. at 431; *cf. Kowalski v. Gagne*, 914 F.2d 299, 303 (1st Cir. 1990) (conviction for second-degree murder, which entailed jury finding that defendant inflicted force upon victim intentionally and in manner that created plain and strong likelihood of death, necessarily encompassed elements of willful, wanton or reckless conduct as defined in wrongful death context).

## B. Excessiveness of Award

The defendant next argues that the trial court's enhanced compensatory damage award for Vicki's wrongful death was so excessive as to be punitive. We disagree.

When reviewing the trial court's award of damages, "we consider the evidence in the light most favorable to the prevailing party below." *Klar v. Mitoulas*, 145 N.H. 483, 487 (2000) (quotation omitted). We will overturn a damage award only if we find it to be clearly erroneous. *Id.*

Punitive damages are not allowed in New Hampshire, *Aubert*, 129 N.H. at 431, unless authorized by statute, *see, e.g., Porter v. City of Manchester*, 151 N.H. 30, 46 (2004) (punitive damages permitted in actions brought under 42 U.S.C. § 1983). "[N]o damages are to be awarded as a punishment to the defendant or as a warning and example to deter him and others from committing like offenses in the future." *Aubert*, 129 N.H. at 431 (quotation omitted).

In *Aubert*, we held that the jury's compensatory damage award of $343,000 was not excessive in light of the defendant's oppression and ill-will and the plaintiff's "severe and traumatic" injuries. *Id.* at 424, 431. Given the defendant's cruelty toward Vicki, which culminated in his premeditated and deliberate murder of her, we cannot say, as a matter of law, that the amount awarded as enhanced compensatory damages was so excessive as to be punitive. *See id.* at 431.

## VIII. Homestead Exemption

Finally, the defendant asserts that he is entitled to the homestead exemption under RSA 480:1. Pursuant to this statute, "Every person is entitled to $100,000 worth of his or her homestead, or of his or her interest therein, as a homestead." RSA 480:1. The homestead right is generally exempt from attachment or encumbrance. *In re Labonte*, 328 B.R. 372, 374 (Bankr. D.N.H. 2005).

The purpose of the homestead exemption is "to secure to debtors and their families, the shelter of the homestead roof; not to exempt mere investments in real estate, or the rents and profits derived therefrom." *Austin v. Stanley*, 46 N.H. 51, 52 (1865). "[O]ccupancy is essential to the existence of the homestead right." *Currier v. Woodward*, 62 N.H. 63, 65 (1882). Such occupancy must be actual and physical in nature. *See id.* The mere intention to occupy the premises as a home at some future time, without actual residency or occupancy, is insufficient to establish a homestead. *Id.* A *temporary* absence from the premises, with the intent to

retain the home there and return to it, is not an abandonment of the home or a relinquishment of the homestead right. *Austin*, 46 N.H. at 52.

 Here, the defendant was sentenced to life in prison, without the possibility of parole. Thus his absence from the home was in no way "temporary." Moreover, by his own admission, the homestead was sold "several years ago" by Clifford Roe, who was appointed by the court to monitor certain of the defendant's real estate holdings. Under the particular circumstances of this case, we hold that the defendant's homestead right has been extinguished.

Given our ruling, we need not address the plaintiff's assertion that the defendant waived the homestead exemption or the defendant's contention that he is entitled to "the net rental profit from his investment real estate" as consideration for waiving it.

*Affirmed.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.