Merrimack
No. 2007-331

ROBERT NENNI & a.

v.

COMMISSIONER, NEW HAMPSHIRE INSURANCE DEPARTMENT

Submitted: October 18, 2007
Opinion Issued: December 18, 2007

*Michael J. Di Cola*, of Alton, by brief, for the petitioners.

*Kelly A. Ayotte*, attorney general (*Glenn A. Perlow*, assistant attorney general, on the brief), for the respondent.

BRODERICK, C.J. The petitioners, Robert and Arlene Nenni, appeal the order of the Superior Court (*Conboy*, J.) denying their motion for summary judgment and granting summary judgment to the respondent, the Commissioner of the New Hampshire Insurance Department (department). We affirm.

The parties stipulated to, or the record reveals, the following facts. On or about January 3, 2000, each petitioner purchased the Polaris II variable annuity (Polaris II) sold by Anchor National Life Insurance Company (Anchor). Each annuity cost $350,000, resulting in a total initial investment of $700,000.

The Polaris II is a group variable annuity product. Upon purchase of the Polaris II, the petitioners became part of a group comprised of individuals across the country who purchased the Polaris II. The members of this group are covered under the master group annuity contract issued by Anchor to Community First National Bank, Trustee.

When they purchased the Polaris II, the petitioners were each issued a certificate evidencing coverage under the master group annuity contract. The certificate, entitled "ALLOCATED FIXED AND VARIABLE GROUP ANNUITY CERTIFICATE," provided, in pertinent part:

> ANCHOR NATIONAL LIFE INSURANCE COMPANY ("We", "Us", the "Company", or "Anchor National") agrees to provide benefits to the Participant under the Group Contract, in accordance with the provisions set forth in this Certificate and in consideration of Purchase Payments We receive.
>
> **This Certificate is evidence of coverage under the Group Contract. The coverage will begin as of the Certificate Date, shown on the Certificate Data page.**
>
> **The value of amounts allocated to the Separate Account during the accumulation and annuity periods is not guaranteed, and will increase or decrease based upon the investment experience of the Variable Portfolios You choose.**
>
> . . . .
>
> **RIGHT TO EXAMINE—You may return this Certificate to Our Annuity Service Center or to the agent through whom the Certificate was purchased within 10 days after You receive it, if You are not satisfied with it. The Company will refund the Purchase Payment(s) paid. Upon such refund, the Certificate will be void. We reserve the right to allocate Your Purchase Payment(s) to the Cash Management Portfolio until the end of the Right to Examine period. Thereafter, allocations will be made as shown on the Certificate Data Page.**

In 1999, the department reviewed and approved this certificate for issuance and delivery in New Hampshire. The department, however, has not reviewed or approved the master group annuity contract for issuance and delivery in New Hampshire. Rather, that contract was reviewed by the Nebraska Department of Insurance and issued in Nebraska to Community First National Bank, Trustee.

In July 2005, the petitioners requested a copy of the master group annuity contract from the department. They received a letter from the respondent's deputy, enclosing a copy of Anchor's 1999 letter seeking the department's approval to sell the Polaris II in New Hampshire. The deputy's letter indicated that the approval stamp affixed by the department on Anchor's letter served as the department's approval of the Polaris II contract for issuance and delivery in New Hampshire. The letter also explained that the petitioners had purchased a group annuity product, rather than an individual annuity product. The letter informed the petitioners that a group certificate cannot be sold to an individual who is not a member of the group and that the petitioners became members of a group when they purchased the Polaris II. The letter further informed the petitioners that when they invested in the Polaris II, they actually invested in the stock portfolios of the Anchor Series Trust and that the investors in the Trust constituted a group.

In November 2005, the petitioners wrote to Anchor's parent company requesting return of their premium investment with three percent interest, alleging that their insurance agent had misrepresented the type of annuity they purchased. In response, the parent company informed the petitioners that they had, in fact, been issued group annuity contracts, as stated in their certificates, and that, pursuant to their certificates, the ten-day period to cancel their contracts and obtain their premium payments had already lapsed. The parent company explained that the petitioners became members of a group when they invested in the Polaris II and its underlying stock portfolios and, as a result, they invested in a group annuity, not an individual annuity.

In August 2006, the petitioners filed a petition for declaratory judgment, alleging that based upon their agent's representations and the forms he provided, they thought that they were purchasing individual, not group, annuities. They alleged that when they realized that they had purchased group annuities, they asked the department about its approval of the Polaris II. They brought the declaratory judgment proceeding because they were not satisfied with the answers they received from the department. They sought, among other things, a declaration that the department violated RSA 408:52 (2006) when it approved the Polaris II for issuance and delivery in New Hampshire. Both parties moved for summary judgment. The trial court ruled in the department's favor, and this appeal followed.

We will affirm a trial court's grant of summary judgment if, considering the evidence and all inferences properly drawn therefrom in the light most favorable to the non-movant, our review of that evidence discloses no genuine issue of material fact, and the moving party is entitled to

judgment as a matter of law. *Stewart v. Bader*, 154 N.H. 75, 87 (2006). We review the trial court's application of the law to the facts *de novo. Id.*

The sole issue for our review is whether the trial court erroneously interpreted RSA 408:52. We review the trial court's statutory interpretation de novo. *Bendetson v. Killarney, Inc.*, 154 N.H. 637, 641 (2006). We are the final arbiter of the legislature's intent regarding the meaning of a statute considered as a whole. *Id.* We first examine the language of the statute, and, where possible, we ascribe the plain and ordinary meanings to the words used. *Id.* When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we refuse to consider what the legislature might have said or add language that the legislature did not see fit to incorporate into the statute. *Id.* Finally, we interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.*

RSA 408:52 provides, in pertinent part:

> No registered insurance corporation or its salesmen or agents shall sell or offer for sale any form of variable contract unless the sale of such form of contract has been approved by the commissioner. Such a corporation desiring to qualify such variable contract form shall submit to the commissioner such descriptive statistical, or documentary information as he may require. The commissioner shall after examination of such information approve or disapprove the sale of such variable contract in the said form.

A variable contract is:

> any life insurance policy or annuity contract issued by an insurance company which provides that the dollar amount of benefits or other contractual payments thereunder may vary according to the investment experience of any separate account or accounts maintained by the insurance company in which amounts received in connection with such policies or contracts have been placed.

RSA 408:27 (2006). The petitioners do not dispute that the Polaris II is a "variable contract" within the meaning of RSA 408:27.

■ The petitioners argue that RSA 408:52 required the department to approve the master group annuity contract before allowing the Polaris II to be sold in New Hampshire. They contend that the phrase "form of contract" as used in RSA 408:52 refers to "the actual master group contract or the form of contract given to individual participants" under

that contract. They assert that because the department approved only the certificate, and did not approve the master group annuity contract itself, the sale of the Polaris II to them did not comply with RSA 408:52, and was void as a matter of law.

The petitioners err by reading the phrase "form of contract" in isolation. "We do not read words or phrases in isolation, but rather in the context of the entire statute." *Appeal of Kaplan*, 153 N.H. 296, 299 (2006) (quotation omitted). RSA 408:52 does not require the respondent to approve the "form of contract"; it requires him to approve "*the sale* of such form of contract." (Emphasis added.) In context, therefore, the use of the word "form" refers to the type or kind of variable contract, rather than the actual paper form. *Compare* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 892 (unabridged ed. 2002) (definition 4(e)(1) defines form as a "printed or typed document with blank spaces for insertion of required or requested specific information"), *with* WEBSTER'S, *supra* (definition 9(a) defines form as "one of the different modes of existence, action or manifestation of a particular thing or substance : KIND, MODIFICATION, SPECIES, VARIETY").

Here, as the trial court found, and as the parties do not dispute, the department approved Anchor's request to offer the Polaris II for sale in New Hampshire. This approval complied with RSA 408:52. By approving the Polaris II for sale in New Hampshire, the department approved the sale of the Polaris II as a "form of variable contract." RSA 408:52. Therefore, we affirm the trial court's ruling that the sale of the Polaris II to the petitioners did not violate RSA 408:52.

*Affirmed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.